[No. 23481. Department One. March 22, 1932.]

STUART BRYAN, *Appellant,* v. FIDELITY & CASUALTY COMPANY OF NEW YORK, *Respondent.*[1]

*Chas. A. Wallace,* for appellant.

*Karr & Gregory,* for respondent.

HERMAN, J.—Plaintiff, as the assignee of J. P. Todd, Inc., brought suit against defendant, basing his cause of action upon what he conceived to be a liability of defendant by reason of the execution of a surety bond by defendant indemnifying J. P. Todd, Inc., against loss through the embezzlement, larceny, forgery, theft, wrongful abstraction, or any other act of fraud or dishonesty of Frank W. Wade, an employee of J. P. Todd, Inc. The case was tried to the court without a jury, and, at the close of plaintiff's testimony, the trial court entered an order of dismissal, on the ground

[1]Reported in 9 P. (2d) 86.

that the testimony introduced by plaintiff was insufficient to sustain a judgment against the defendant. Plaintiff appeals from the order of dismissal.

Appellant makes four assignments of error, and treats them collectively in discussing the question: Did appellant in this case make out a prima facie case to entitle him to recover from respondent on the cause of action set forth in his complaint?

J. P. Todd, Inc., appellant's assignor, is a corporation, organized in February, 1926. Hans Heidner, Frank Wade and M. J. Heidner were named as trustees in the articles of incorporation. They subscribed for all of the two hundred shares of capital stock of the corporation. The shares had a par value of one hundred dollars each.

Hans Heidner paid ten thousand dollars for one hundred shares. One share was issued to M. J. Heidner, for which he paid one hundred dollars. Frank W. Wade subscribed for the remaining ninety-nine shares, and executed his note for $9,900, payable to the corporation. This note was delivered to M. J. Heidner, vice-president of the corporation. Along with this note, Mr. Heidner was given a certificate of stock for ninety-nine shares issued to Mr. Wade, which certificate was to be held by the vice-president as collateral until Mr. Wade's note was paid.

Hans Heidner was president of the corporation, and Frank W. Wade was its secretary-treasurer. This arrangement as to officers continued until April, 1929, during which month a bond, the subject matter of this litigation, was executed, bearing date April 24, 1929, whereby respondent agreed to indemnify appellant's assignor, J. P. Todd, Inc.,

". . . against the loss, not exceeding five thousand ($5,000) dollars, of any money or other personal property (including money or other personal property

for which the employer is responsible) through the embezzlement, larceny, forgery, theft, wrongful abstraction or any other act of fraud or dishonesty of Frank W. Wade, hereinafter called the employee, directly or in connivance with others, while the employee is engaged in the service of the employer, while this bond is in force.''

The trial court, in its memorandum decision, gave the following reasons for entering the order of dismissal:

''Now, this bond, if it means anything, it means that there be a going entity independently of the one whose acts are insured against. It provides that the employer shall notify the company any time that it discovers that there has been any wrongdoing on the part of the employee.

''Now, the books were kept in regular form according to the testimony. There was no attempt on the part of Mr. Wade to conceal any of his acts, so far as the evidence goes, and that is what the court has got to rely on. He drew the checks, he kept the stubs evidencing them, as far as the evidence shows—at least there is no evidence to the contrary, and it is never presumed one is guilty of fraud, but that is a matter of proof. There was nobody to become acquainted with what Mr. Wade was doing except himself and the vice-president, who, as far as the evidence goes, was inactive.

''Now, it is never the policy of the law, and I think against public policy, for one to be insured against his own wrongful acts. I do not think any court would enforce an insurance policy issued to myself against my stealing my own property, because it would be to my advantage to conceal my property and recover against the insurance company.''

Respondent attempts to justify the trial court's position by citing the case of *Farmers & Merchants State Bank v. U. S. Fidelity & Guaranty Co.,* 28 S. D. 315, 133 N. W. 247, 36 L. R. A. (N. S.) 1152, wherein the court said:

"When the policy in suit was issued, James H. Carroll was the owner of only five shares of the plaintiff's capital stock; its entire capital being $10,000. On October 10, 1904, before the alleged fraudulent acts were committed, he became the owner of 51 shares previously owned by his brother, constituting a majority of the stock, with power to select a new board of directors. After that date, he was in position to absolutely control the affairs of the bank. . . . The precise question under discussion is the effect of the fact that Carroll became the owner of a majority of the capital stock, practically becoming master of the corporation, and ceasing to be one of its servants. Clearly here was a situation not contemplated by the parties when the policy was issued, and not embraced by any fair and reasonable construction of its terms. In absence of convincing evidence, it would be unreasonable to assume that the defendant would insure the conduct of any man thus situated. An undertaking insuring a person against his own dishonesty would be, to say the least, a novel and unusual contract. Had the plaintiff been a natural person engaged in the banking business, and this employee purchased the business or a controlling interest therein, certainly no one would contend he could maintain this action for his own benefit or that of the depositors. The object of the undertaking was to insure an employer against the fraudulent acts of an employee, not to insure an employer against his own fraudulent acts. When the person whose conduct is insured ceases to be an employee, within any fair and reasonable interpretation of the term as used in the policy, the insurer's liability should cease, unless he has notice of the change."

March 1, 1929, O. Greenberg purchased from Mr. Wade thirty shares of his stock, paying three thousand dollars to J. P. Todd, Inc. The same day, Peter R. Wahl purchased ten shares of Mr. Wade's stock, paying five hundred dollars to the corporation and agreeing to pay an additional five hundred dollars. The certificate for ninety-nine shares previously is-

sued to Mr. Wade, and then being held by the corporation as collateral for the payment of his note, was surrendered and canceled. New certificates for thirty shares and ten shares were issued to Mr. Greenberg and Mr. Wahl, respectively. A certificate for fifty-nine shares was issued to Frank W. Wade, and pledged as collateral for the payment of the balance of $5,900 then due upon his note.

During April, 1929, Hans Heidner made an agreement to sell his one hundred shares of stock to Frank W. Wade, and the stock certificate issued in Hans Heidner's name for his shares was put in escrow, to be delivered to Mr. Wade upon payment by him of the amount due under the terms of the escrow agreement.

During the time the bond was in force, Frank W. Wade, according to his own testimony, overdrew on his personal account approximately $5,500 of the corporation's funds. From April 26, 1929, until April, 1930, Mr. Wade was the president, secretary and treasurer of J. P. Todd, Inc., and M. J. Heidner was vice-president, owning one share of stock. During that time, there were no meetings of the trustees and no directors' meetings. Between the dates mentioned, the certificate for fifty-nine shares of stock which had been issued in the name of Wade, together with the certificate for one hundred shares in the name of Hans Heidner and one share in the name of Mr. Wallace, a trustee, were held in escrow by the National Bank of Commerce, to be delivered to Mr. Wade upon his payment of the amount due according to the terms of the escrow agreement.

During the period when Mr. Wade was overdrawing his personal account with J. P. Todd, Inc., none of the stock of that corporation was in his possession, the fifty-nine shares issued in his name and the one hundred one shares held in the name of two other stock-

holders being held in escrow, the total of one hundred sixty shares to be delivered to Wade upon his making the payments called for by the escrow agreement. Under these circumstances, it cannot be maintained that Wade was the owner of the majority of the stock in the corporation. Clearly, he did not cease to be an employee within the fair and reasonable interpretation of the term, as used in the policy.

■ Respondent further attempts to justify the action of the trial court in entering the order of dismissal, on the ground that the bond in question provides that the employer shall notify the surety company any time it discovers that there has been any wrongdoing on the part of the employee. An examination of the bond discloses in paragraph 5 the following provision:

"Upon the discovery by the employer of any dishonest act on the part of the employee this bond shall terminate, without any action on the part of the surety, as to any act committed thereafter by such employee, *but the knowledge by such employee shall not constitute knowledge on the part of the employer.*"

The italicized words were typewritten on the printed form of the bond, indicating clearly an intention of the parties that the knowledge of Frank W. Wade as to his violation of trust should not be imputed to the insured. The record does not show a failure on the part of the insured to give to the surety timely notification upon discovery of the wrongful abstractions.

Appellant made out a prima facie case, and the trial court erred in entering a judgment of dismissal. Reversed and remanded, with directions to the trial court to set aside the judgment of dismissal.

TOLMAN, C. J., PARKER, BEELER, and MITCHELL, JJ., concur.